UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

RYAN MACIAS,

Plaintiff,

v.

STATE OF OREGON; OREGON DEPARTMENT OF CORRECTIONS; THOMAS BRISTOL; WARREN ROBERTS; JOE BUGHER; JOSHUA HIGHBERGER; and KRYSTA LYNCH,

Defendants.

Case No. 6:23-cv-01738-MTK

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

Plaintiff Ryan Macias brings claims under 42 U.S.C. § 1983 alleging that Defendants violated the Eighth Amendment to the U.S. Constitution by failing to provide him adequate medical care while he was in custody of the Oregon Department of Corrections ("ODOC"). Defendants move for summary judgment. For the reasons discussed below, Defendant Bugher's motion for summary judgment is granted, and the State Defendants' and Defendant Roberts' motions for summary judgment are granted in part and denied in part.

## BACKGROUND

Plaintiff is an individual who was formerly an adult in custody ("AIC") at ODOC. When Plaintiff entered ODOC custody in February 2019, he had an existing injury to his left knee and

internal hardware in that knee. Decl. Ryan Macias ("Macias Decl.") ¶¶ 1-2, ECF No. 48. On February 27, 2019, Plaintiff reported in an ODOC medical history screening that he had a "chronic . . . leg wound" and that he was awaiting results from an MRI. Aggrey Decl. Ex. 101, at 3, ECF No. 32-1.

On February 28, 2019, an X-Ray Report noted that "[t]here appears to be a tunnel entering the distal femur" and there was a "mild narrowing of the lateral compartment," but "[o]therwise, no acute or chronic abnormality [was] seen." Meyer Decl. Ex. B, at 33, ECF No. 34-2.

On April 29, 2019, Plaintiff's knee was "swollen [and] leaking pus," so providers cleaned and covered the wound and suggested "[d]ressing changes as needed." Aggrey Decl. Ex. 101, at 29. Those notes also indicated a "[r]isk of" and "concern for infection." *Id.*

On May 6, 2019, another X-Ray Report showed "mild narrowing of the lateral compartment" and "no interval change" was noted. Meyer Decl. Ex. B, at 31.

On May 28, 2019, Plaintiff was seen by Richard A. Carpenter, M.D., at Motion Orthopedics. Meyers Decl. Ex. B, at 21-23. Dr. Carpenter treated Plaintiff "for a draining wound in his right thigh." Aggrey Decl. Ex. 101, at 81. Dr. Carpenter noted that "screw heads are sticking through posteriorly and may be the source of his chronic infection." *Id.* He noted:

> I think the best thing to do would be to take the screws out, which could contribute to his chronic infection. . . . We will then get a deep wound culture and debride this and place him on antibiotics and hopefully the culture will give us the bacteria, which is probably methicillin-sensitive Staph aureus. He is on doxycycline right now and it may not be effective. We will be happy to do this as the prison arranges for this.

*Id.*

In June of 2019,[1] providers removed screws from Plaintiff's knee and performed a deep culture of the wound. Edwards Decl. Supp. Resp. State Defs.' Mot. ("Edwards Decl.") Ex. 1, at 9, ECF No. 49-1; Aggrey Decl. Ex. 101, at 82-93. Over the next few days, the wound was treated and dressed in fresh bandages, but continued to drain and tunnel. Edwards Decl. Ex. 1, at 8-9.

On July 31, 2019, an X-Ray Report showed "what appear[ed] to be an oblique ghost tunnel in the distal femur" but was "unremarkable otherwise." Meyer Decl. Ex. B, at 30.

Also on July 31, 2019, Dr. Carpenter saw Plaintiff and noted that he "continue[d] to drain." Edwards Decl. Ex. 1, at 73. Dr. Carpenter wrote that "[i]t [was] his belief that it would be best treated by a team of vascular surgeons and ortho because it is . . . so associated with vascular that he needs a vascular surgeon at least available." *Id.*

On August 1, 2019, Defendant Roberts and the Therapeutic Levels of Care ("TLC") Committee, an ODOC medical review board, considered Dr. Carpenter's proposal of surgery and instead recommended another MRI. Edwards Decl. Ex. 1, at 56.

---

[1] The date of this surgery is less than clear, but not materially in dispute. State Defendants represent that "[o]n June 13, 2019, Plaintiff had screws removed from his knee and a deep culture was performed by the outside provider." State Defs.' Mot. 3 (citing Aggrey Decl. Ex. 101, at 82-93). The records cited by the State Defendants contain a referral sheet from ODOC referring Plaintiff for an appointment with Dr. Carpenter on June 13, 2019, and other records describing wound culture results from that same date. Aggrey Decl. Ex. 101, at 82-93. The ODOC referral form contains a note that appears to say "removed two screws[;] obtained deep cultures" by a provider on June 13, 2019. *Id.* at 93. Other evidence provided by Plaintiff also suggests that on June 13, 2019, Plaintiff underwent "[r]emoval of 2 screws from the left knee." Edwards Decl. Ex. 1, at 75.

For his part, Plaintiff represents that he underwent the procedure to remove the screws from his knee on July 17, 2019. Pl.'s Resp. State Defs.' Mot. 3 (citing Edwards Decl. Ex. 1, at 7). The document cited by Plaintiff is a page of ODOC progress notes that show that on July 17, 2019, Plaintiff "returned from outside med trip." Edwards Decl. Ex. 1, at 7. Several entries earlier in those notes show that Plaintiff also "returned from outside med trip" on June 13, 2019, and was that day "seen upon return from surgical intervention to remove screws in [left] thigh [and] deep wound cultures." *Id.* at 9. Dr. Carpenter wrote in his July 31, 2019 note, that Plaintiff was being "seen . . . post operative for removal of his screws on 07/17/19." Edwards Decl. Ex. 1, at 73.

On August 6, 2019, ODOC providers scheduled Plaintiff for an MRI with an outside provider. Aggrey Decl. Ex. 101, at 15, 80. The MRI found "[a]n osseous tunnel extends through the metaphyseal region of the distal femur broaching the medial cortex and externalizing through adjacent subcutaneous soft tissues to the skin surface." Edwards Decl. Ex. 1, at 74.

On September 13, 2019, Plaintiff was seen for tenderness in his wound when he reported that it was "swollen, hot, [and] with green drainage," though no drainage was apparent at that visit. Edwards Decl. Ex. 1, at 4. Progress notes indicate that providers were "seeking . . . consult with provider to ensure [appointment] with ortho is sched[uled], unable to find [appointment] . . . ." Edwards Decl. Ex. 1, at 4. Five days later, Plaintiff's "leg started bleeding" and the wound was "open, bloody." Edwards Decl. Ex. 1, at 4. Providers cleaned the wound and "[i]ssued [large] bandaids for [Plaintiff] to self care." *Id.* They also noted that Plaintiff "ha[d] upcoming appointments regarding [the] wound." *Id.*

On September 27, 2019, Plaintiff reported in an inmate communication form that his knee was "starting to bleed and hurting more" and inquired about the results of his MRI and the next steps. Edwards Decl. Ex. 2, at 3. ODOC staff noted that an appointment was requested and scheduled for October 22, 2019. Edwards Decl. Ex. 2, at 3.

On October 18, 2019, Plaintiff was seen again regarding his "knee infection," and reported continued swelling and drainage. Edwards Decl. Ex. 1, at 3. "Referral [was] sent to Hope Ortho – according to Dr. Carpenter [Plaintiff] most likely will need a debridement but . . . the vasculature . . . make[s] the procedure difficult in this rural setting. He advises transferring to an ortho center where vascular and infectious disease can consult." Edwards Decl. Ex. 1, at 3.

On November 17, 2019, Plaintiff reported to ODOC that "the pain [was] getting way worse and still leaking fluid" and he asked for an update as to his knee surgery. Edwards Decl.

Ex. 2, at 4. In response, ODOC staff noted "as of today there is no surgery scheduled." *Id.* Similarly, on December 3, 2019, Plaintiff inquired about his knee surgery and ODOC staff responded that no appointment was scheduled and they were "waiting on outside provider." Edwards Decl. Ex. 2, at 5.

On January 6, 2020, Plaintiff again reported that his knee was bleeding. Edwards Decl. Ex. 1 at 24. On January 21, 2020, Plaintiff was seen at OHSU "[d]ue to concern for a progressive and worsening infection if not addressed at this time, requiring large resection of bone in the future, will plan for open debridement of this tract and his draining sinus." Edwards Decl. Ex. 1, at 80-81. ODOC staff noted that "Dr. Carpenter recommends debridement again" in a "complex location" and requested further evaluation and treatment from OHSU. Aggrey Decl. Ex. 101, at 73. Provider recommendation notes both describe the surgery as "[n]on urgent" and state that "[i]n action likely will result in more bony involvement requiring [a] larger operation [and] higher costs of care." Aggrey Decl. Ex. 101, at 74.

On February 7, 2020, Plaintiff again inquired as to whether his surgery was scheduled, and ODOC responded that it was "too soon to know surgery date." Edwards Decl. Ex. 2, at 6.

On February 27 and 28, 2020, almost seven months after Dr. Carpenter's surgery recommendation, the ODOC TLC team approved Plaintiff's surgery at OHSU, and ODOC physicians placed an order with OHSU for surgery. Aggrey Decl. Ex. 101, at 14, 72.

No party cites to any evidence of what occurred between February 28, 2020, and February 17, 2021, though Defendants contend that Plaintiff's surgery was then delayed due to the COVID-19 pandemic.

On February 17, 2021, Plaintiff reported that his wound was bleeding and he "couldn't get it to stop bleeding." Edwards Decl. Ex. 1, at 54. Providers cleaned the wound, applied dressings, and gave Plaintiff instructions to watch for infection. *Id.*

On March 6, 2021, an ODOC officer sent Plaintiff to the medical clinic for his "infected wound" and Plaintiff "noted a hardware protruding out of the skin, needle like hardware not sharp at the tip," plus more drainage and tenderness. Edwards Decl. Ex. 1, at 53. Plaintiff was then seen at Santiam Hospital for an "[a]bscess like structure" with "drainage," and prescribed antibiotics. Aggrey Decl. Ex. 101, at 10, 65-71. The wound continued to drain between March 8-11, 2021. Edwards Decl. Ex. 1, at 53.

On March 12, 2021, ODOC contacted OHSU about follow up plans. Aggrey Decl. Ex. 101, at 25. On March 16, 2021, doctors at Blue Mountain Diagnostic Imaging evaluated Plaintiff's knee and found "what appear[ed] to be an oblique ghost tunnel in the distal femur." Meyers Decl. Ex. B, at 30. Images of Plaintiff's knee were "unremarkable otherwise." *Id.*

Plaintiff's wound continued to drain and be cleaned and cared for in April 2021. Edwards Decl. Ex. 1, at 42-52. On April 11, 2021, Plaintiff's blood culture tested positive for staphylococcus aureus. Meyers Decl. Ex. B, at 35.

On May 4, 2021, OHSU providers saw Plaintiff and again recommended and evaluated Plaintiff for surgery. Edwards Decl. Ex. 1, at 76 ("Based on chronicity and failure to resolve with antibiotics treatment, [OHSU providers] continue[d] to recommend surgical intervention"); Suppl. Aggrey Decl. Ex. 102, at 1-2, ECF No. 60. The TLC team approved an MRI and surgical procedure for Plaintiff on May 6, 2021. Aggrey Decl. Ex. 101, at 61.

In June of 2021, Plaintiff continued to inquire about next steps, report symptoms to ODOC, and request additional bandages to care for his wound, which he stated "continu[ed] to

leak and drain non-stop, day and night." Edwards Decl. Ex. 2, at 8-12. He inquired about his surgery four times over July and August of 2021. *Id.* at 13-16.

On October 17 or 18, 2021, Plaintiff "felt a 'pop' sensation deep in [his] knee, and then saw a string sticking out from the wound." Macias Decl. ¶ 7; Edwards Decl. Ex. 1, at 38. ODOC medical staff treated Plaintiff, cleaned his wound, and noted a "suture type plyable material sticking out," but otherwise "only gave [Plaintiff] a bandage." Edwards Decl. Ex. 1, at 38; Macias Decl. ¶ 7. On or about October 18, 2021, Plaintiff returned to medical and again received only a bandage. Macias Decl. ¶ 8. Plaintiff "was extremely upset because this wound had been an ongoing problem for years by this point, and it was only getting worse and more painful, and now there was a string hanging out of it." *Id.* That day, Plaintiff saw Defendant Highberger in the hallway, showed him the wound, and begged him to help him get medical attention. *Id.* Defendant Highberger "said he would take care of it." *Id.*

On October 20, 2021, Defendant Thomas Bristol saw Plaintiff and "touched the wound repeatedly while examining it with his unwashed, ungloved hands" and pulled on the string and trimmed it, which caused Plaintiff pain. Macias Decl. ¶ 9. "Over the next two weeks, the wound became increasingly more painful and began oozing pus. It also began to smell terrible." *Id.* ¶ 10. Plaintiff reported his symptoms to medical. *Id.*

On November 3, 2021, Plaintiff returned to see Defendant Bristol who "again failed to even wash his hands or use gloves and started touching [Plaintiff's] open wound with his unsanitary hands." Macias Decl. ¶ 11. Defendant Bristol told Plaintiff that blood test results from October 20, 2021 were negative for infection and otherwise did not provide any other medical attention to Plaintiff, despite that "the wound was still oozing and smelled badly." *Id.*

On November 5, 2021, Plaintiff again returned to medical where he saw Defendant Bristol, who "took a wound culture by jamming a swab into the wound without any painkiller or numbing, which caused [Plaintiff] immense pain and ongoing bleeding." Macias Decl. ¶ 12. A "few days" later, Plaintiff was told that he had tested positive for staph infection and received prescription antibiotics. *Id.*; Edwards Decl. Ex. 1, at 27-28.

The wound continued to get worse, bleeding, oozing fluid, and causing Plaintiff pain. Macias Decl. ¶ 13; Edwards Decl. Ex. 1, at 27. "At one point, it leaked so much fluid that it soaked [his] pants." Macias Decl. ¶ 13.

On December 10, 2021, Defendant Bristol saw Plaintiff and again "touched the wound without putting on gloves or even washing his hands." Macias Decl. ¶ 14. That day, Plaintiff also saw an orthopedic specialist at Hope Orthopedics who recommended surgery and "explained that there was concern all the way back in January 2020 . . . that [Plaintiff] had 'chronic draining osteomyelitis.'" Macias Decl. ¶ 14; Edwards Decl. Ex. 1, at 59-64.

On December 15 or 16, 2021, the TLC committee approved the surgery for Plaintiff's knee. Edwards Decl. Ex. 1, at 57.

Plaintiff finally had surgery in January of 2022. Macias Decl. ¶ 15. The open wound finally healed, but Plaintiff still experiences pain and burning in his knee. Macias Decl. ¶ 16.

In sum, Plaintiff had an open wound on his leg for at least three years, from the time he entered ODOC custody in February 2019 until his surgery in January 2022. Macias Decl. ¶¶ 1-2. "The entire time the wound was open, it was painful and leaked fluid," at times "leak[ing] so much fluid that [Plaintiff's] clothing and bedding became wet." *Id.* ¶ 3. The pain was sometimes "severe and interfere[d] with [Plaintiff's] ability to perform daily living activities." *Id.* No one at ODOC ever told Plaintiff why his surgery was not being scheduled. *Id.* ¶ 5. Plaintiff submitted at

least 21 communication forms requesting additional information or attention to help him get care for his wound. *See* Edwards Decl. Ex. 2.

Plaintiff filed two grievances with ODOC regarding the level of medical care he was receiving, in May and October of 2021. Edwards Decl. Ex. 3, at 2-4, 10-12. In May of 2021, ODOC responded to Plaintiff's grievance—through a non-party to this case—that "[t]his past 14 months have been very difficult for Health Services across the state," and "[d]ue to the worldwide COVID-19 Pandemic patients have had to wait for outside medical care unless a medical emergency was present." Edwards Decl. Ex. 3, at 1. ODOC "apologize[d] for the length of time [Plaintiff] ha[d] been uncomfortable" but noted that "this has largely been unavoidable because of the pandemic." *Id.* In November of 2021, ODOC—through Defendant Roberts—responded that "[Plaintiff] ha[d] received timely and adequate medical care." Edwards Decl. Ex. 3, at 7. On May 3, 2022, ODOC—through Defendant Bugher, Assistant Director of Health Services—denied Plaintiff's appeal of his grievance and "support[ed] the medical opinion of Dr. Warren Roberts, Chief Medical Director." *Id.* at 5.

## STANDARDS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the

absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## DISCUSSION

### I. Eleventh Amendment Immunity

To start, Defendants ODOC and Roberts argue that claims against them are barred by the Eleventh Amendment. The Eleventh Amendment bars suits against the State and its agencies, absent unequivocal consent by the State. *Jensen v. Brown*, 131 F.4th 677, 696 (9th Cir. 2025).

#### A. Defendant ODOC

Plaintiff alleges a claim for negligence against State Defendant ODOC. Defendant ODOC has not waived its right to sovereign immunity. This Court accordingly lacks jurisdiction to hear claims against it. Plaintiff's negligence claim is dismissed without prejudice.

#### B. Defendant Roberts

Defendant Roberts moves for summary judgment against damages claims brought against him in his official capacity, arguing that the Eleventh Amendment extends immunity to state officials. Plaintiff does not dispute this argument. Pl.'s Resp. 1 n.1. Plaintiff's claims against Defendant Roberts in his official capacity are dismissed without prejudice.

### II. Plaintiff's Deliberate Indifference Claim

Plaintiff alleges that Defendants violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs.

42 U.S.C. § 1983 allows a person to sue a state actor for the deprivation of a right protected by federal law. *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011). To bring a claim under § 1983, the plaintiff must show that each named defendant, through their own individual actions, violated the plaintiff's constitutional right. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Prison officials and physicians violate the Eighth Amendment's proscription against cruel and unusual punishment when they act with deliberate indifference to an AIC's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To sustain this claim, Plaintiff must establish the existence of "a serious medical need" and show that "defendant's response to the need was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (quoting *Estelle*, 429 U.S. at 104).

A prison official acts with deliberate indifference when he knows that an AIC is faced with a "substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Deliberate indifference to an AIC's serious medical needs may be shown by the denial, delay, or intentional interference with medical treatment or by the manner in which prison officials provide medical care. *Estelle*, 429 U.S. at 104-05; *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002). The indifference to an AIC's medical needs must be substantial; inadequate treatment due to negligence, inadvertence, or differences in opinion between AICs and medical personnel do not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 105-06. "A prison official acts with deliberate indifference only if the prison official knows of and disregards an excessive risk

to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal quotation marks and alterations omitted). "Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *Id.* (citation omitted).

**A. State Defendants**

Defendants Thomas Bristol, Joshua Highberger, Krysta Lynch,[2] and ODOC (collectively, "State Defendants") move for summary judgment and argue that they provided Plaintiff constitutionally adequate care.

Here, there is no dispute that Plaintiff's wound constituted a serious medical need. State Defs.' Mot. 7 n.1. The State Defendants argue that they did not act with deliberate indifference because "Plaintiff received significant medical attention" and "the COVID-19 pandemic impacted the timing of his care." State Defs.' Mot. 7-8.

To start, as discussed above, Plaintiff did receive medical attention while in ODOC custody. But that is not the question before this Court. An inmate's Eight Amendment rights can be violated even if they receive medical treatment. *See, e.g.*, *Ortiz v. City of Imperial,* 884 F.2d 1312, 1314 (9th Cir.1989) ("Contrary to appellees' arguments, however, appellants need not prove complete failure to treat Ortiz. As this court has stated, 'access to medical staff is meaningless unless that staff is competent and can render competent care.'") (citation omitted). The Eighth Amendment may also be violated where there is a failure to *competently* treat a serious medical condition. *Id.*

[2] In his Response, "Plaintiff does not object to dismissal of Defendant Lynch without prejudice from this action." Pl.'s Resp. State Defs.' Mot. 1, ECF No. 47. Plaintiff's claims against Defendant Lynch are dismissed without prejudice.

Next, Defendants offer that "Plaintiff's surgery was indefinitely delayed due to the COVID-19 pandemic." State Defs.' Mot. 4. In support of this crucial assertion, Defendants cite two pages in the record: (1) ODOC documentation of physician's orders made to "OHSU ortho" on February 26 and 28, 2020 (Aggrey Decl. Ex. 101, at 14); and (2) a TLC form that approves an "OHSU ortho surgery" on February 27, 2020 (*id.* at 72). Neither of those pieces of evidence suggests, much less establish, that Plaintiff's surgery was delayed because of the pandemic. Generalized assertions that treatment throughout the state were delayed is insufficient to settle the matter as to whether the pandemic was the reason Plaintiff's treatment was delayed. Furthermore, Defendants ask this Court to make inferences *against* Plaintiff, which is inappropriate since Plaintiff is the non-moving party.

The only evidence that suggests a pandemic occurred at all during this time period comes in the form of a May 2021 grievance response in which ODOC staff represented that "[d]ue to the worldwide COVID-19 Pandemic patients have had to wait for outside medical care unless a medical emergency was present." Edwards Decl. Ex. 3, at 1. That post-hoc rationale is insufficient to eliminate genuine disputes of material fact as to whether Defendants caused any of the delays in Plaintiff's treatment.

Although a reasonable fact finder could infer that Plaintiff's surgery was delayed because of the pandemic, they could also infer that some failure of Defendants' was the reason that Plaintiff was not seen for surgery sooner than January 2022. The Ninth Circuit recognizes that prison officials may be held liable for deliberate indifference where they delay an inmate's medical care and the delay is harmful. *Snow v. McDaniel*, 681 F.3d 978, 990 (9th Cir. 2012) ("In order to prove deliberate indifference through delay of medical care, then, Snow must show that

Dr. MacArthur's failure to schedule an appointment for him led to further injury."); *Jett v. Penner*, 439 F.3d 1091, 1096-98 (9th Cir. 2006).

As noted above, Dr. Carpenter first recommended Plaintiff for debridement on May 28, 2019. When Dr. Carpenter again recommended surgery in July 2019, ODOC's TLC team opted instead for an MRI. Edwards Decl. Ex. 1, at 56, 73. Over the next several months, through at least January of 2020, Plaintiff's wound continued to swell, bleed, drain, and cause him pain. Aggrey Decl. Ex. 101, at 15, 80; Edwards Decl. Ex. 1, at 3-4, 24, 74, 80-81; Edwards Decl. Ex. 2, at 3-5. Thereafter, Plaintiff was seen "[d]ue to a concern for a progressive and worsening infection if not addressed at this time," where doctors at OHSU again recommended surgery. Edwards Decl. Ex. 1, at 80-81. Providers were aware that "[i]naction likely will result in more bony involvement requiring [a] larger operation [and] higher costs of care." Aggrey Decl. Ex. 101, at 74. ODOC finally approved Plaintiff for surgery at the end of February 2020, almost seven months after Dr. Carpenter identified that Plaintiff needed surgery. And Plaintiff did not receive that surgery until *almost two years later.* Defendants' unsupported assertions—that COVID-19 caused the delay and that "ODOC routinely followed up with OHSU to schedule the surgery once nonemergent surgeries were being scheduled again"—are insufficient to merit judgment as a matter of law. State Defs.' Mot. 4. Rather, the evidence viewed in the light most favorable to Plaintiff indicates that Plaintiff's medical care was delayed for unknown reasons while both his pain and his condition worsened.

**B. Defendant Roberts**

Defendant Roberts asserts that his only involvement in Plaintiff's claims is that he responded to one of Plaintiff's grievance appeals. Def. Roberts' Mot. 6 (citing Meyer Decl. Ex. A, at 10). Roberts' briefing represents that he "was appointed to the TLC Committee in December 2020 and served until December 2024." Def. Roberts' Mot. 6. But Plaintiff submits

evidence that Defendant Roberts was part of the TLC Committee in August 2019 when it declined to authorize Plaintiff for the recommended surgery, and instead recommended an MRI. Edwards Decl. Ex. 1, at 56 (TLC form with "Roberts" and other names circled, indicating that Roberts and others were present and part of that decision). Additionally, on December 21, 2021, Defendant Roberts reviewed Plaintiff's grievance in which Plaintiff stated that he had attempted to get care for his knee for "several years" and was experiencing "severe pain" when "walking, sitting, sleeping, or any other activity that involve[d] movement of [his] knee." Edwards Decl. Ex. 3, at 10-12. Defendant Roberts wrote in response that Plaintiff was "referred to an Orthopedic specialist" and that his "left thigh wound is clean and free of signs and symptoms of infection." Meyer Decl. Ex. A, at 10.

In sum, the evidence shows that Defendant Roberts, who played a significant leadership and decision making role in the TLC, was involved in at least two critical decisions related to Plaintiff's medical care: a recommendation for an MRI instead of surgery in August 2019, and then a response to a grievance in December 2021 in which Plaintiff informed Roberts that he had been attempting to get care for years and was experiencing severe pain. Viewing the facts in the light most favorable to Plaintiff, a reasonable fact-finder could conclude that Defendant Roberts personally participated in the denial or delay of Plaintiff's medical care. *See Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). A jury could find from this record that Defendant Roberts, as Medical Director of ODOC and member of the TLC Committee, acted with deliberate indifference to Plaintiff's health because he knew that surgery was recommended in 2019, recommended an MRI instead, and thereby participated in the delay and denial of Plaintiff's care in a way that left him in worse condition and experiencing "severe pain" more than two years later. *See, e.g.*, *Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012), *overruled*

*on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014) ("Snow may prove deliberate indifference by showing that prison administrators or physicians denied, delayed, or intentionally interfered with surgery for his hip condition."); *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989) (delay alone is not enough, but delay plus officials' awareness of pain and additional harm is sufficient to state a claim). Defendant Roberts' motion is denied as to this claim.

Defendant Roberts' motion is also denied at this stage as to Plaintiff's claim for punitive damages. There is insufficient evidence to conclude as a matter of law that Roberts' conduct was not "malicious, wanton, or oppressive" under the circumstances. *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).

### C. Qualified Immunity

The State Defendants and Defendant Roberts contend they are entitled to qualified immunity on Plaintiff's deliberate indifference claim.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). The purpose of qualified immunity is to "strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Pearson*, 555 U.S. at 231). Qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231.

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

As discussed above, a reasonable fact finder could find that the State Defendants and Defendant Roberts acted with deliberate indifference to Plaintiff's medical needs in violation of his Eighth Amendment rights. It was clearly established in 2019 that prison officials may not delay an inmate's care in a way that causes additional harm. *See Jett v. Penner*, 439 F.3d 1091, 1096-98 (9th Cir. 2006); *Snow v. McDaniel*, 681 F.3d 978, 990 (9th Cir. 2012) ("In order to prove deliberate indifference through delay of medical care, then, [Plaintiff] must show that Dr. MacArthur's failure to schedule an appointment for him led to further injury."). Accordingly, taking the facts in the light most favorable to Plaintiff, Defendants' conduct would be in violation of clearly established constitutional law. Defendants are not entitled to qualified immunity at this stage.

**III. Plaintiff's Claim for Failure to Train and Supervise**

Plaintiff alleges that State Defendants Highberger and Lynch, in addition to Defendants Bugher and Roberts, violated his Eighth Amendment right to constitutionally adequate medical care by failing to adequately train and supervise subordinate staff.

Supervisors may be liable under § 1983 for "1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022)

(quotation marks and citation omitted). To succeed on this claim, "the plaintiff must show that the official was 'deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." *Id.* (quotation marks and citation omitted).

**A. State Defendants**

The State Defendants argue that there is no evidence they failed to train or supervise in a way that harmed Plaintiff. In response, the only evidence Plaintiff offers is his October 2021 encounter with Defendant Highberger, in which Highberger assured Plaintiff "he would take care of" Plaintiff's injury. Macias Decl. ¶ 8. That single encounter is insufficient to show that Defendant Highberger's or any other State Defendant's failure to train or supervise caused Plaintiff's harm. The State Defendants' motion is granted as to this claim.

**B. Defendant Roberts**

Defendant Roberts also moves for summary judgment on this claim. Although Plaintiff submits a report authored by a Jill Goldsmith to show that Defendant Roberts has a pattern of delaying and denying necessary medical care, that evidence does not establish anything as it pertains to Defendant Roberts' treatment of *Plaintiff* or how Roberts' supervision or training affected *Plaintiff's* constitutional rights. Accordingly, the Court declines to consider that evidence at this stage. No other evidence indicates that Defendant Roberts' failure to supervise or train caused Plaintiff's injuries. Defendant Roberts' motion is granted as to this claim.

**C. Defendant Bugher**

Defendant Joe Bugher was the Assistant Director of Health Services for ODOC during the period relevant to Plaintiff's claims. Decl. Joe Bugher Supp. Mot. Summ. J. ¶ 2 ("Bugher Decl."), ECF No. 27. Defendant Bugher "had no involvement in the medical decisions made by the [Therapeutic Level of Care Committee] or by [Oregon State Correctional Institution] medical

providers concerning [P]laintiff's medical care." *Id.* ¶ 3. Rather, as Assistant Director of Health Services, Defendant Bugher reviewed inmate appeals from medical grievance decisions made by Defendant Roberts, the ODOC Medical Director. *Id.* ¶ 4.

On May 3, 2022, Defendant Bugher issued a letter informing Plaintiff that Bugher "support[ed] the medical opinion of Dr. Warren Roberts, Chief Medical Director." Bugher Decl. Ex. 1, at 5, ECF No. 27-1. Defendant Bugher "relied on the medical opinion of Dr. Roberts that [P]laintiff had received timely and adequate medical care in denying the grievance." Bugher Decl. ¶ 5. That evidence, which only shows Bugher's involvement months after Plaintiff ultimately received the surgery he needed, is the only evidence of Bugher's role in this case. That is insufficient to show Defendant Bugher's personal involvement in delaying or denying Plaintiff's medical care. Defendant Bugher's motion for summary judgment is granted.

**CONCLUSION**

For the reasons discussed above, Defendant Bugher's Motion for Summary Judgment (ECF No. 26) is GRANTED. The State Defendants' Motion for Summary Judgment (ECF No. 31) is GRANTED in part and DENIED in part. Defendant Roberts' Motion for Summary Judgment (ECF No. 33) is GRANTED in part and DENIED in part.

DATED this 3rd day of September 2026.

MUSTAFA T. KASUBHAI (he/him)
United States District Judge